Mr. Sanger, good morning. Good morning, Your Honors. Robert Sanger for the appellant. But please, the Court, I would make one procedural observation, one personal one, before I start, if I could. The procedural observation is neither side substituted the respondent, as was ordered by the Court. I didn't realize that until I was looking at the Court's order this morning. So I assume we can do that at the appropriate time. The Attorney General responded on behalf of Mr. Davis instead of Mr. Broomfield. But I think we can accomplish that to comply with the Court's order, if that's all right. The personal observation is Mr. Lewis, Robert Lewis, Jr., was in the Sun Death row for nine years when I was appointed to represent him. At that time, I was 44 years old. I'm now 74 years old. It's been a long journey. I'm sorry, when did you represent him? Yes. I'm sorry? When did you represent him? I'm having trouble with the hearing. I was appointed to represent him by the Supreme Court in his direct appeal in habeas in 1993. So it's been 30 years. Here we are to talk about the merits, finally, I hope. So thank you for allowing me to say that. The merits of this, I mean, we can talk about the individual issues in the case, which I think are significant in and of themselves. But this, quite frankly, is a case that's a shame. And it was one of many that was handled by this particular defense lawyer who took appointments and billed for $27,000 and some odd dollars in every case. He later became a California commissioner for many years. He became a family law commissioner, and we actually had an opportunity to cross-examine him. And after he retired in the hearing on the Atkins issue before Judge Perry in the Superior Court a few years ago, before the California Supreme Court agreed with Judge Perry's report that Mr. Lewis was ineligible for execution based on the fact he's intellectually disabled. I mean, your point is very effective rhetorically. And I apologize, Your Honor. The question is how do you tie it into some doctrinally available point? In other words – I'm sorry. I couldn't hear you. Well, what I'm saying is suppose what you're saying is true, you still have to prove your particular case. That's true. That's true. But I think the context is important. And I know the Attorney General has taken the position that this is an ad hominem attack and therefore should be disregarded. And that's why I'm addressing it up front. I think it is a situation where the course of conduct of this particular lawyer is relevant. The problem is that we would have to get into all of these other cases. We don't know what they are. We don't know what the facts are. There's a dispute about the facts. He won some of them. He lost some of them, et cetera. And it's just not really pertinent. So I suggest you get to your case. Yes. And I'm not sure that he won any of them, but I'll submit that. My impression was that some of them lost on habeas. Let's put it that way. So going to the merits, I did want to respond to the Attorney General's remark on that, though. Going to the merits, I mean, this particular case, first of all, setting aside the context, this particular case, the defendant was found guilty in about three and a half days of trial, including jury selection in a capital case, and then, of course, he had a one-hour and 36-minute penalty phase. That's been resolved by way of Atkins. But a three-and-a-half-day trial, first of all, raises some serious issues. When we look at the actual context, and it's established in the record, it turns out that the defense lawyer hired a private investigator, gave her an assignment. The assignment was to interview a few witnesses who were family members who came to court. She was not able to get into the jail to see the defendant, but she billed for that time. And then the week of the trial, when the trial began, after the defense lawyer got back from a one-month vacation, he told the investigator to run out and try to find this hotel registration card, which she did. So that was good. It was last minute. The problem with that was that the clerk or the manager who testified to the card did not lay a foundation for the card. As was established after the case, Ms. Kleinbauer, the investigator, had run out to the hotel. Did the prosecution argue that that wasn't really the card? I'm sorry. The prosecutor argued that that was not the card, that that was a false card. Yeah. The argument was that the card was meaningless because the father had filled out the information. Well, I understand that, but that's a different question from whether the card was what it purported to be. Did anybody argue that it wasn't what it was purported to be? I'm not clear on the distinction because the way I see it is this. Forgive me if I'm missing the court's question here. What really happened was the card was in the possession of the hotel. Ms. Kleinbauer, the investigator for the defense, had gone out to the hotel, got the card, took possession of it, so it was in the possession, in the business records of the hotel. She took possession, brought it to court. The testimony was that the hotel manager or motel manager said, well, I filled out the part about when he came into the hotel and when he left, but the father filled out the information about the vehicle. I didn't fill that out, she says. Okay. So that leaves the question in the jury's mind is how authentic is this card? If the jury had been presented with the fact that the- Why does that lead to a question of how authentic is the card as opposed to how did the father come to fill out the card with the license plate of the Cadillac? Well, because the whole issue is whether or not the Cadillac's information, the license plate and the description of the card, whether or not that was actually written on October the 24th of 1983, which was prior to the homicide. But the card was admitted, right? The card was admitted, yes. Okay. I didn't see any dispute about its authenticity. It sounds like what you're arguing is that you wish defense counsel had even further bolstered its authenticity to tell the jury not only has this been admitted and for you, but it is really, really authentic. That seems to be what you're arguing. You want the defense lawyer to have really showcased the authenticity of this document more than he did. I'm not saying showcase, Your Honor, respectfully. I'm saying that what was missing was – let me put it this way. If the jury had heard that the card came directly from the hotel or motel, it's referred both ways. If the card had come directly from – I think it was a motel. But I thought they did hear that it came from the motel. They heard the manager say, that is a card and that's my handwriting, that's one of our cards, that's what we do. And I think the patron filled out the bottom part. Right, okay. And here it is in court. What the jury didn't hear was that the investigator got it from their business records and that's the way it was at the time. Let me go back to my question. Did the prosecutor argue that this was filled out later? I don't believe the prosecutor specifically argued that, but this is point number one in our list of points. It left the implication that there was no evidence as to how the card got to court and whether the father could have filled it out and filled out the information after the fact. So if you had Ms. Kleinbauer say, I picked it up – manager who got the card out of the file, did she testify? She testified. And she testified, I got this card out of the file and this is what it looked like when I got it out of the file. She didn't say this is what it looked like when I got it out of the file. But she didn't say it didn't either. She didn't say it didn't. She just said, yeah, that's my handwriting on the top and I think that's the patron's handwriting on the bottom. So there was an argument that the registration for the card, that the bill of sale for the card had been forged. So the jury had that argument in front of them that there had been a forged document. I'm sorry, who made that argument? You said they didn't make that argument. They did make that argument, yes. As to the registration. Registration for the car. Oh, but not as for the car. For the car. For the car, not the registration. Not for the hotel. Two separate documents. So there's a question as to whether or not evidence had been manipulated. You know, it's not just – All right, do you want to argue about something else? It's not just a matter of trial preference. I think it was critical in this case because it would have been very easy to have Kleinbauer simply testify, I got it, or have the manager say, yes, this is a business record, this is exactly what it looked like when I gave it to Ms. Kleinbauer. Do you have a declaration from her saying what she would have said if you were asked? We do. That's in the record, Ms. Kleinbauer. And she would have said that it wasn't – that wasn't filled out when she got it? No, Ms. Kleinbauer, the investigator, would say that she got it from the business records and brought it to court. I see. But she didn't say it to the jury. But you don't have anything from the person who produced the car? The person who produced the – The person at the motel who produced the car. I don't know that we have an additional declaration. That's what I mean. You only have her testimony at trial. We have her testimony at trial. Her testimony, I think, was correct that, you know, this is a car that came out of the business records, but she wasn't able to say what happened to it in the interim. And I think it's – and it's emblematic of the problem that we have with this case, which is there was no investigation, no serious investigation. This is a death penalty case, and death penalty is overturned, but it's still a murder case, first-degree murder case, and you've got no investigation being done. Just go out and talk to the family members who are coming to court. Go talk to the client in custody who can't get in to see him. And then at the last minute after the – But on habeas, it seems to me – I mean, my own assessment that this was not the strongest murder case in the world, to put it mildly, but there are a couple of things that seem relatively strong, and you're not attacking them on habeas. That is, the – first of all, the California Supreme Court said that there were three of his fingerprints in the room. That's wrong, right? There was just one palm print. Is that right? My understanding was there was one palm print, and the Attorney General referred to it as a bloody palm print, and it was not. And that's not true. I understand that. It was a latent – latent print. And were there also fingerprints? The California Supreme Court just got that wrong. I can't answer that. No, no. Okay. I don't think so. But in any event, nobody has contested the palm print out of habeas. No, you haven't sent anybody into – under current standards to figure out whether the palm print was actually his palm print or how good the science is or anything like that. So let's put it this way, Your Honor. That is obviously something we would have looked into. I don't think there's anything in the record. And also, on the forgery of the registration, no one's contested so far the registration – that the signature on the registration was forged. That has – no, that's not being contested on habeas. All right. So those two pieces of sort of forensic evidence are to be presumed valid for our purposes. That's the record. All right. Go ahead. That's the record. All right. So as Your Honor said, it's not the strongest case. It's also not the weakest case, but it's a case that should have been tried properly to the jury, and it wasn't. The next point, which I think is really critical, is this chain. The – Mr. Wong, who was the actual proprietor of the jewelry shop, gave a declaration after the fact that, yeah, that was his letterhead, his stamp, his handwriting, and, yes, apparently he sold these two chains. The investigator nor the defense lawyer ever asked the – Mr. Wong about this, and he wasn't asked about it for 20 years, it turns out. Okay, but now you don't have anything definitive again. You have Mr. Wong saying, yeah, because it's the wrong chain. It's still the wrong chain that's on the receipt. And he says, well, maybe I made a mistake. I don't know. Well, he says there were two chains on the receipt. Right, and neither of them matches the chain that we're talking about. Well, the one that matches the chain doesn't match the length. Right, and the other one that matches the length doesn't match the type of chain. But still, we're talking about a jury. We're talking about whether or not the jury had an opportunity to determine if there was reasonable doubt, right? And the fact of the matter is you had the actual proprietor who – you had the receipt, and the actual proprietor was available back in the day, and we have a declaration that he was available. The phone number on his receipt was still a good phone number. He was never even called. Defense lawyer, after the fact, said, well, he talked to somebody else he knew who looked at it in the cursory fashion and said it didn't match the other chain on the receipt. Well, it didn't match either chain. Well, it's not clear that he actually formed an opinion as to both entries. But, in other words, he looked at the one that was – The right length. I'm sorry? The right length. Yeah, that was the same length and said it doesn't match that, and then he didn't really compare the other one. The difference between an 18-inch and a 20-inch chain may or may not be important. So I do want to try to reserve two minutes if I could. I may not have said that. So let me just hit real quick. That was a big point. I think the – you know, those – who knows what else he could have done. Years and years after the fact, we're able to establish those things that were not done properly. And then you look at the argument that he makes. I mean, that's one of the most shameful things is that he gets up in the middle of the argument and says, oh, I was thinking – I forget his exact words now since I'm standing here – but I was just thinking about this, and it kind of bothered me. Maybe there are two people there. Maybe Mr. Lewis is there with somebody else. Well, what exactly did he actually say? It's on page 2, I think, of my opening brief. Let me see if it's – if I'm right about that. Okay. No, I'm sorry. That's page 45. It wasn't any close. He says, but there is something else I think you have to consider. One little nagging thing that bothers me is the police investigated this crime. I think there is someone else involved. Do you think someone else could have been involved with Mr. Lewis? Has this been ruled out? Well, not really. Well, that says involved. It doesn't say who was in the house. Okay. I mean, I don't want to argue with the court on that. That's correct. I read the quote. But if you're the juror, you're going, okay, here's the defense lawyer who has made a very weak argument, a very brief argument, and then he turns to this and spends the next few pages, however long that took, talking about, oh, I was just – this is nagging me. Maybe there are two people. Maybe there's another person with Mr. Lewis. Now, if he was really going to pursue that, then he should have gotten the jury instructions. But he didn't say with Mr. Lewis. That's the point. He said – There's another person involved. I'm sorry. There was another person involved. He said, do you think someone else could have been involved with Mr. Lewis? Right. But not that he was with Mr. Lewis. I mean, the reason it matters is because if there's this whole scheme that if you think that there was a scheme to make it look like there was a sale but there was actually a robbery, somebody could have been involved with that, most likely his father, who was involved with him but was not there during the murder. So the notion that they're inconsistent doesn't seem even to be so. Well, I think what he's – and I'm going to run out of time here. But I think what he was saying, I think what the jury would have heard him say, besides what his actual words were, is that, oh, okay, so he's in the house. Now, his defense was that he got the car on the 24th and the death was the 28th. I understand that. My point isn't what he said. He didn't say somebody else was in the house. He didn't say that, but a heavy implication is that you could have been involved with Mr. Lewis. You got the palm print on the door jamb, the latent print. I mean, that seems to me to be pretty much throwing the defendant under the bus at that point and then not asking for the appropriate jury instructions, which we briefed, and I'm not going to have any time to respond. No, we will give you time to respond. We'll give you three minutes when you come back, and thank you for your argument. Okay, thank you very much, Your Honor. Good morning, Your Honors, and may it please the Court. Deputy Attorney General Louie Carlin for Respondent. I do apologize for the reference to bloody in my brief. It was an inadvertent mistake. I tried to figure out why I said that, and it was just that I worked on a case years ago where the defendant, unlike Mr. Lewis, did leave a bloody palm print, but Mr. Lewis didn't. It was just a palm print next to the toilet paper. Were there also fingerprints, as the California Supreme Court said, or is the California Supreme Court just wrong? Your Honor, I don't know. I read the fingerprints in the opinion. It's never been challenged, to my knowledge. I'm challenging it. I see that. No, I don't know. I didn't follow up on that because it's never been challenged. We know that there was the palm print. We know there were other fingerprints that were not tested because they were all tested, but they were only compared against the victim and Mr. Lewis. So there were these other fingerprints there. We know that. But as far as were there other fingerprints of Mr. Lewis outside of the California Supreme Court opinion, I do not know. The implication, there's some other person's fingerprints in there. We don't know who they were. Right, and that's what counsel is trying to do in this final argument. In context, if you look at what he's saying, the page after the involved statement was made, he has to deal with the fact that it's there. And so what does he say? I'm at SER 26. The fingerprints were there. The fingerprints show the presence of somebody. They don't show the presence of somebody when. They just show the presence of somebody. So his argument was, look, you don't know when these prints were left. That's all he can say. Yes, he's trying to say we can't deny that he had possession of property, but the fingerprints still are circumstantial evidence. That's all it is. He's trying to raise a reasonable doubt. As to the motel registration card. The reason why this case doesn't, the facts don't hang together for me very well is because you have this person that we now know has a severe intellectual disability, and he apparently was forging documents and forging and doing something about this card, which you can't really figure out, and was stupid enough, and maybe he was, to wear a stolen chain to his preliminary hearing. It's all a very strange set of facts. It is, Your Honor. May I talk about the motel registration card, though? Because this really shows that counsel, they haven't come close to showing anything wrong that he did. Ms. Shen, the agent at the motel, testified without any objection. The card is in for all purposes. I filled out the top part. Someone else filled out the other part. It had the Cadillac's license plate number on it, and I filed it away. The key question is, not the code. But did she say that the Cadillac license number was on it when she filed it away? Exactly. It was on it when I filed it, which was the key. You said that? Correct. That was the key part. To the extent you can come up with an alibi, that's what matters, Your Honor. It's the date. And did the prosecution say it was doctored? The prosecution did not say it was doctored. The prosecution just said, look, this Cadillac had been for sale for a long time. It had been publicly displayed. But, again, that suggests a plot by this guy who had a 60 IQ or something. Oh, no, it wasn't a 60 IQ. Well, 70 IQ, whatever it was. It was his father who filled out the card, though, not him. Right. So what counts is that the card was filed two days prior to the murder. That's what counts. That's why it's a potential alibi. That was never challenged. Calling Ms. Kleindauer wouldn't help in the least. The neighbors said they saw him on the 27th. That's correct. Because they said it was their bowling night or something. That's correct, Your Honor. But they could have been wrong about that, the date. They could have been wrong. They could have been wrong. So this was one of the few things that counsel could have done. This card was filed before the murder, and it had the Cadillac's license plate number on it. Would calling an expert to show chain of custody have helped that? Not in the least. It would have been cumulative at best. And the defense really didn't want to demonstrate that the witnesses were wrong about the date, because if they're wrong about the date, it could have been three days earlier, and then the whole alibi falls apart. Correct. Yeah. I mean, that's what they can do. As far as intellectual disability, it's important to point out what's missing from the declaration that's relied on on habeas. Because no argument to the district court was made that, hey, we could have done an intellectual disability impairment defense. We've got a 40-page declaration from a qualified expert, Dr. Kosanoff. Well, it doesn't help. Where is the testimony, where is the opinion from Dr. Kosanoff, that whatever intellectual disabilities he had would have prevented him from doing these things? Well, it's not there. But that isn't the question. It would have prevented him from having the intent, either with regard to first-degree murder or with regard to felony murder.  Could he have done things that are the equivalent of that? Could he have done things? Was he mentally capable of doing things like forming that would lead up to, that would make it the intent to commit a murder for the purpose of robbery? So there are two essential things to look at. Number one, the opinions that counsel did get. He hired two highly qualified mental health experts. Judge Perry is clear on this. Dr. Sharma was as good as they get. Dr. Maloney was highly qualified. He had written a book on mental retardation before the trial. Both of them say there was nothing wrong with him. Well, that turns out to be wrong. No, it didn't, Your Honor. It absolutely did not. That's a different question from whether there was anything wrong with him that was relevant to the conviction. But the notion that there was nothing wrong with him turns out to be wrong. Oh, no, no. What I mean is, to quote from the record, Dr. Sharma's findings. This is SCR 127. This is based on an in-person interview in 1983 or 84. Petitioner's speech was goal-directed, coherent, and logical. He found no evidence of psychosis, organic brain disorder, depression, or any other major disorder, and agreed with the previous definition. And mental retardation would not have been a major disorder that was pertinent? Well, he deferred to Dr. Maloney on mental retardation, as it was called then, and Dr. Maloney, who was an expert, said he was not. And at the reference hearing, he said, I still think, under 1984 standards, he was not. Standards have changed. But as much as they've liberalized such that he qualifies as intellectually disabled today. What about the gold chain? It does seem somewhat inexplicable, or put another way, a competent lawyer would have gone to the jeweler who supposedly sold the chain rather than some random other jeweler. Well, no, Your Honor. Actually, if you look at what he did, he says, I've got this chain. I've got this receipt from the sister. What I want to find out is can we bolster her testimony with the receipt? I talked to a jeweler. The jeweler says, if they're trying to show it's that chain, it's a forgery, it's a fraud, or it's mistaken. And at that point, what's he supposed to do? Go to the juror? There's no point to going to the jeweler to find out what we've now found out again is that the jeweler can't offer anything positive. The jeweler cannot help bolster the sister's testimony. Well, it bolstered it to the extent of demonstrating that she, in fact, bought chains from that person at around that time. Right. But then the prosecution gets up and says, but it's not that chain. It doesn't help. She got up at trial and said, I know the chain. I bought it. So how could we help this? We could bolster it with a receipt, but not a receipt that doesn't match the chain. If counsel had done that, we'd be making the same argument, except he's saying he was ineffective for putting up a jeweler who could offer testimony that would just be impeached. It doesn't pan out. None of the evidence that we've looked at after decades of reexamination helps his case at all. Again, there's simply nothing there As far as the closing argument, the California Supreme Court, Judge Baroff below, both said that involvement was not, that word was not, should not be interpreted and would not have been reasonably interpreted as conceding the case. There's another person who agrees with that, and that's the prosecutor, because when the prosecutor got up, he did not say, they just conceded their case. They just conceded he was there at the time. No, he didn't say that. He didn't understand it that way. No one did. Now, again, as far as intellectual disability, we have to understand that this crime made it very clear that the person who committed it knew what he was doing and knew it was wrong and tried not to get caught. I will give you just a few examples. After gagging and binding Mr. Estelle, he was stabbed at least twice, not three times, with a knife with sufficient force to break bones. But after that, possibly before, but certainly in addition to, he was shot in the back. The evidence before the jury showed that when Petitioner shot him, he took a pillow from another room and used it as a silencer. He's trying not to get caught. This is a lot of mental wherewithal, and there's nothing to show that he was unable to think, I'm robbing someone, I'm eliminating the witness, and then after I get out, he also locked all the doors from the inside, stuck the victim, hid him away, and then when he's caught, he has these elaborate, not terribly convincing, but elaborate statements to the police about how it wasn't him. So he knew what he was doing. He knew it was wrong. He tried to cover it up. Under California law, a mental defense only works if you can show that the impairment prevented you from forming the intent. We have nothing. If the Court has additional questions, I'd be happy to answer them. And we're hearing none. I want to thank you, Mr. Carlin, for your presentation, and we'll hear rebuttal from Mr. Sanger. Thank you. So quickly, on the mental impairment issue, it's not a claim that they should have advanced a diminished capacity defense, which was done away with by the people, actually, at some point. That's not the point here. The point is that had there been an adequate investigation, including an adequate investigation of the mental condition of the defendant, there would have been a totally different trial, in my opinion. Now, we can't go back and reconstruct the entire trial. Could you be more specific about that? I thought you were arguing that there would have been a diminished capacity defense. So what are you arguing? Not a diminished capacity defense, but a defense that he couldn't have formed the intent for the crimes with which he was charged. So if you're not arguing that, what are you arguing? So the way the trial was tried is what we're stuck with. And it was tried in a very haphazard fashion, and then the closing argument resulted in this sort of, I was bothered by this, whatever the words were we read. The one little nagging thing that bothers me. And all of a sudden he changes and says, well, maybe somebody else is involved. If he's going to do that, then he should have gotten jury instructions, as a matter of fact, and then he should have pursued some sort of evidence that he clearly could have had. I mean, Dr. Malone, whatever— You would start by saying that the mental health defense information was important for some reason, but not for the men's right. That's what I'm interested in. So what was it important for? So if he's going to claim that there was more than one person involved, and that was going to be his defense, then he should have shown, and my client is clearly not a leader. He has mental impairments, whether it's mental retardation or close to mental retardation or whatever, Dr. Malone. Well, that all would have been important in the penalty phase, but why would it have been important in the appeal phase? Just what the attorney general argued here. He says, look at this. The attorney general's words were, look at this. The petitioner, I think he called him, but the appellant, said, when the petitioner shot the person, when the petitioner used the pillow, all these things show, all this calculation locked the door. You mean that he couldn't, that it was all too complicated? But we know he did do some things, like lie about his name when he was stopped and put the registration in his girlfriend's name and not his because he quoted one in his name, whatever that means. So he was in some way manipulating the system, the record. As I think Your Honor said, and I think the attorney general agreed, it wasn't a very competent job of trying to cover things up. So you speculated, for instance, I think, that it may well have been the father who was involved in all this. There's a whole thing about the father. Well, the father had to be involved in some way because he is the one who signed the motel. So if the motel, if there was some plot to steal the car later and to make it seem as if they had it earlier, then it had to be the father who was involved in it. I guess my point, and I run a, I don't want to be. Please respond. Okay, thank you. My point is, you know, we can look at all these things. It's not the kind of trial that somebody should deserve. And quite frankly, this is a, the clientele of this particular lawyer were primarily poor people of color from Long Beach. And one after another, he'd line them up and get them convicted. I know that you want me to move on to the particulars, but I think the context is really important because this man, an intellectually disabled man, had no chance. He comes into a court with a lawyer who says, yeah, sure, I've been appointed to take your case, then takes a vacation, I'll have an investigator see you. Investigator doesn't see him. In fact, Mr. Slick said he couldn't get in to see the defendant at the jail, so he billed the county for an hour here and an hour there for waiting at the jail and never got to see him. You know, if you were a person in Long Beach at that time, in the 80s, and you got assigned this particular defense lawyer, you weren't going to get a defense, and he didn't get a defense. There are a lot of details we called out here that I asked the court to consider individually, but you look at them all together. Look at the, we didn't get to the jury selection, but look at that he left a juror on who was friends with the investigating officer, who's another, several who had experiences with law enforcement, one who had been a victim represented by the same prosecutor, or the same prosecutor was the prosecutor in the case where he was the complaining witness. So it just, it was not a defense. And I stand here after all these years and ask that you remand this case for an order to show cause hearing, an evidentiary hearing before the district court, or simply look at it. Well, if we did that, why would there be an evidentiary hearing? That's another question. Or say, or alternatively, simply find that there was ineffective assistance of counsel. Under AEDPA, there was no attempt to get a hearing, there was an attempt to get a hearing on the penalty phase, but not on the guilt phase, I think, in state court, is that right? In state court? Yeah. No, there is a request for a hearing on everything, but the Supreme Court only ordered on Atkins and penalty phase issues, ineffective assistance in the penalty phase. And besides which, we have the whole procedural default issue that we're not addressing at this point unless we end up, which hasn't even been briefed, and if we ended up thinking there was anything on the merits in any of your claims, we'd have to either ourselves or more likely send it back for a Martinez determination. Yes. Right? Well, that's On most of these issues. Which ones, by the way? Which ones, as to which ones is there no exhaustion issue? As to which claims is there no exhaustion issue? Oh, as to which ones is the, I think that's raised by the Attorney General all the time in everything, so I'm not sure exactly where there's a legitimate claim. I mean, all of this was briefed before the Supreme Court, and the Supreme Court did not have an evidentiary hearing, so it's not No, I'm asking you a different question. The Supreme Court said that a chunk of the claims were denied both on the merits and because they were too late. So there would be a, there's a procedural default question as to a chunk of the claims, which wasn't reached below because he proceeded to the merits instead. So do you know which those were? I don't as I stand here.  I can answer the Court's question, but I can't. Thank you very much for your time. Thank you, Mr. Singer. We thank both parties for the briefing and argument. This case is submitted. This concludes our calendar here. The Court wishes to thank the staff here in the Pasadena Courthouse, and particularly the AV staff and our courtroom deputy, Ms. Manning. This concludes our court session for this week, and we are adjourned.
judges: BERZON, RAWLINSON, BRESS